IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS

**JEAN ELAINE HAUGHT,**

                Plaintiff,

**v.**

                                      **CIVIL ACTION NO.: 2:15-CV-99**
                                      **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

                Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On December 22, 2015, Plaintiff Jean Elaine Haught ("Plaintiff"), through counsel Travis M. Miller, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On February 3, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 5; Admin. R., ECF No. 6). On March 4, 2016, and April 4, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11). On April 11, 2016, Plaintiff filed a Response to Defendant's supporting brief. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), ECF No. 13). The matter is now before the undersigned United States Magistrate Judge for a Report

and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On September 30, 2012, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on August 20, 2012.[1] (R. 19, 157). Because Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2017, Plaintiff must establish disability on or before this date. (R. 19). Plaintiff's claim was initially denied on November 14, 2012, and denied again upon reconsideration on January 4, 2013. (R. 99, 108). After these denials, Plaintiff filed a written request for a hearing. (R. 111).

On May 7, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") Terrence Hugar in Morgantown, West Virginia. (R. 19, 33, 126). Plaintiff, represented by counsel Travis M. Miller, Esq., appeared and testified at the hearing. (R. 19, 33). James W. Primm, an impartial vocational expert, testified via telephone. (R. 19, 33, 35). On June 27, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 16).

Subsequently, Plaintiff requested that the Appeals Council review the ALJ's decision and submitted additional evidence for the Appeals Council to consider. (R. 8-9). However, on November 12, 2015, the Appeals Council determined that the

---

[1] Plaintiff has previously filed three unsuccessful claims for DIB. (R. 121). After filing the instant, fourth claim, Plaintiff drafted a letter to Joe Manchin, III, a United States Senator from West Virginia, requesting help with her claim. (See R. 120-21). Additionally, on April 3, 2015, Plaintiff drafted a letter to David McKinley, a United States Representative from the First Congressional District of West Virginia, requesting help with her claim. (See R. 241-42).

additional evidence was not relevant[2] and denied Plaintiff's request for review,

rendering the ALJ's decision the final decision of the Commissioner. (R. 1-2).

### III.  BACKGROUND

**A.  Personal History**

Plaintiff was born on July 30, 1962, and was fifty years old at the time she filed

her claim for DIB. (See R. 79). She is 5'6" tall and weighs approximately 185 pounds.

(R. 184). She is married and lives in a house with her husband. (R. 47, 194). She

completed school through the twelfth grade and additionally completed a two-year

medical assistant course. (R. 185). Her prior work experience includes working as a

finance coordinator for an automobile dealership. (R. 55, 186). She alleges that she is

unable to work due to the follow ailments: (1) fibromyalgia; (2) chronic fatigue

syndrome; (3) depression; (4) hypothyroidism; (5) anxiety; (6) muscle spasms; (7)

memory fog; (8) vertigo; (9) carpal tunnel syndrome and (10) shoulder and lower back

pain. (R. 184).

**B.  Medical History**

**1.  Medical History Pre-Dating Alleged Onset Date of August 20, 2012**

On June 29, 2009, Plaintiff presented to a West Virginia University ("WVU")

Healthcare facility, complaining of an enlarged thyroid. (R. 313). An ultrasound of

Plaintiff's thyroid revealed a "nodule within the left thyroid lobe that is . . . probably a

---

[2] Plaintiff submitted a medical record reporting that Plaintiff had tested positive for fibromyalgia after being administered "The Fibromyalgia Test" on April 20, 2015. (R. 9). The Appeals Council reasoned that the record was not relevant because:

> The [ALJ] decided your case through June 27, 2014. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before June 27, 2014.

(R. 2).

benign nodule." (Id.). Subsequently, Plaintiff underwent a partial thyroidectomy. (See R. 413). After her thyroidectomy, Plaintiff returned to WVU Healthcare several times throughout the following year for follow-up appointments to monitor her condition but no significant post-operative changes were noted during any of these appointments. (R. 313, 315, 317).

On August 19, 2011, Plaintiff presented to her primary care provider, Josalyn Mann, D.O., complaining of increasing fatigue. (R. 280). Dr. Mann noted that Plaintiff had been examined by an endocrinologist for her fatigue and that the endocrinologist prescribed her Synthroid and Cytomel for hypothyroidism. (Id.). Dr. Mann further noted that the endocrinologist informed Plaintiff that her bloodwork was normal and that her fatigue was not related to her medications. (Id.). After examining Plaintiff, Dr. Mann diagnosed Plaintiff with malaise and fatigue, vitamin D deficiency disease, hyperlipidemia and hypothyroidism. (R. 281). To treat Plaintiff's hyperlipidemia, Dr. Mann prescribed pravastatin. (See R. 281, 293). To treat Plaintiff's fatigue, Dr. Mann increased Plaintiff's dosage of Synthroid and instructed her to cease taking Cytomel and to start taking a vitamin D supplement. (See R. 281, 298). Subsequently, Dr. Mann documented that Plaintiff "[is] feeling some better now" on her new medication regimen. (R. 282).

In September of 2011, Plaintiff presented to various medical facilities complaining of, *inter alia*, fatigue, headaches and sinus pressure. (See R. 257-60, 271-77, 319). A CAT scan of Plaintiff's brain was ordered due to her complaints of headaches, which revealed "[n]o acute intracranial process[es]." (R. 319). Plaintiff was diagnosed with

sinusitis and other related conditions and prescribed allergy medication. (R. 258, 260, 273).

In 2012, Plaintiff presented to Dr. Mann's office on multiple occasions with continuing complaints of fatigue, sinusitis and headaches. (R. 285-92). On February 13, 2012, Dr. Mann noted that Plaintiff had been feeling depressed and less motivated in recent weeks. (R. 285). As a result, Dr. Mann added depression and anxiety to Plaintiff's list of diagnoses. (R. 286). Dr. Mann also noted that Plaintiff was already prescribed Cymbalta, an antidepressant, but increased the dosage. (Id.). On April 4, 2012, Dr. Mann noted "[b]ruising everywhere" during her examination of Plaintiff and added myalgia and myositis to Plaintiff's list of diagnoses. (R. 287-88). On April 24, 2012, Dr. Mann noted that Plaintiff had tried Topamax for her headaches but found it ineffective. (R. 289). Dr. Mann also diagnosed Plaintiff, *inter alia*, as being overweight and suffering from sleep disturbances, despite taking Ambien, a sedative, every night. (R. 289-90). On June 29, 2012, Dr. Mann decreased Plaintiff's dosage of Cymbalta due to complaints of sexual dysfunction, although she noted that Plaintiff "[d]id better" on a higher dose. (R. 291). Dr. Mann also noted that Plaintiff was "[t]rying to restart Topamax" for her headaches and was experiencing difficulty losing weight, despite "trying to aggressively watch [her] diet and . . . exercise some." (Id.).

On August 14, 2012, Plaintiff presented to United Hospital Center, complaining of decreased hearing, possibly related to recurrent sinus infections. (See R. 264, 292). Multiple tests and scans were ordered, which revealed that "a sinus cavity might be blocked." (R. 265). Subsequently, Plaintiff was diagnosed with allergic rhinitis, post nasal drip, reflux chronic sinusitis and myofasciitis. (Id.). Plaintiff was instructed to

attend physical therapy for her myofasciitis and to aggressively treat her allergies. (Id.). Plaintiff was prescribed Zetonna and Allegra for her allergies. (Id.).

### 2. Medical History Post-Dating Alleged Onset Date of August 20, 2012

On August 28, 2012, Plaintiff presented to Bridgeport Express Care, complaining of ongoing fatigue. (R. 268). Plaintiff explained that she had been experiencing fatigue "for the last few months" and "fe[lt] like she could sleep all day long." (Id.). Plaintiff further explained that she suffers from "chronic fatigue, thyroid trouble, and fibromyalgia." (Id.). Blood work was ordered, the results of which were normal. (R. 270, 275). That same day, Plaintiff also returned to United Hospital Center, complaining that her symptoms had not improved despite her new medications. (R. 262). A CT scan was ordered, revealing continuing sinusitis. (R. 263). Therefore, a balloon sinusplasty was ordered to open Plaintiff's left sinus passage. (Id.).

On September 13, 2012, Plaintiff changed her primary care provider from Dr. Mann to Lance Dubberke, M.D. (R. 385). Plaintiff complained to Dr. Dubberke of severe fatigue and chronic muscle pain in her neck, shoulders, arms, back and legs. (Id.). Dr. Dubberke noted that Plaintiff also suffered from depressive and "some obsessive symptoms." (Id.). Dr. Dubberke examined Plaintiff, noting that Plaintiff experienced tenderness at multiple pressure points, meeting the criteria for fibromyalgia. (R. 386). Afterwards, Dr. Dubberke diagnosed Plaintiff with fibromyalgia, depression, fatigue and hypothyroidism. (Id.). Dr. Dubberke prescribed amitriptyline for her fatigue, discontinued her prescription of pravastatin and ordered a sleep study, although Plaintiff later cancelled the study. (R. 386, 410).

On September 19, 2012, Plaintiff presented to Shelley P. Kafka, M.D., of Mountain State Rheumatology, after being referred by Dr. Dubberke. (R. 333, 346). Plaintiff informed Dr. Kafka that she suffers from chronic pain "all over" and that, while she had tried massage and physical therapy in the past, "they did not provide her with much relief." (R. 333, 360). After an examination, Dr. Kafka diagnosed Plaintiff with polyarthralgia. (R. 364). Dr. Kafka noted that this diagnosis is consistent with fibromyalgia but that further evaluation was needed to rule out other conditions before a definitive diagnosis could be made. (Id.). Dr. Kafka instructed Plaintiff to take ibuprofen for her pain and recommended "Physical Therapy/Water Therapy," which she declined because "she does not want to have to wear shorts or a bathing suit in front of anyone." (Id.).

On October 2, 2012, Plaintiff returned to Dr. Dubberke's office for a follow-up appointment regarding her visit to a rheumatologist. (R. 376). During this visit, Dr. Dubberke documented that Plaintiff's "husband says she has been more confused lately," which he noted was consistent with a fibromyalgia diagnosis. (Id.). As a result, Dr. Dubberke increased Plaintiff's dosage of amitriptyline and instructed Plaintiff to cease taking Ambien. (Id.). Dr. Dubberke also recommended pool therapy, explaining that it "would really benefit" her, but Plaintiff continued to decline the recommendation. (Id.).

Plaintiff presented to Mountain State Rheumatology several times in October of 2012. At the beginning of the month, Plaintiff called the facility and stated that she was scheduled to return to work on October 8, 2012. (R. 326). Plaintiff then requested that a physician "fill out [a] Short-term Disability Form for [her boss] . . . . [because] she feels

that with her [fibromyalgia] and memory issues she . . . [should not] drive." (Id.). On October 3, 2012, Plaintiff called the facility again, complaining of generalized pain, and was prescribed tramadol. (R. 324). On October 17, 2012, Plaintiff reported that the tramadol was "not helping." (R. 404). Plaintiff was again encouraged to participate in therapy but refused due to "insecurities." (R. 404-05). Plaintiff was prescribed trazodone and was encouraged to keep her appointment with a psychiatrist, which she had previously scheduled. (See R. 405).

On October 18, 2012, Plaintiff returned to Dr. Dubberke's office for a follow-up appointment regarding her fibromyalgia. (R. 431). During this visit, Dr. Dubberke noted that, while Plaintiff was on Savella and tramadol for her fibromyalgia, she reported that "she is no better," although he documented that these medications require continued use for "at least a couple [of] months" before their effectiveness can be assessed. (Id.). Additionally, Dr. Dubberke noted that:

> [Plaintiff] has a lot of stress with her family. She has 1 daughter who has been difficult, has 4 children by 4 different husbands, and [she] has been pretty upset by the whole situation. She also gets stressed about going to work and just says she has problems there. Just feels like she is under too much anxiety and stress right now . . . .

(Id.). After an examination, Dr. Dubberke again recommended pool therapy, which Plaintiff stated was "just not going to be a possibility." (Id.). Dr. Dubberke also encouraged Plaintiff to keep her appointment with her psychiatrist, which "[s]he was thinking of [canceling]." (Id.). Later that month, Plaintiff underwent her psychiatric evaluation[3] and was diagnosed with a mood disorder secondary to her medical

---

[3] Muhammad Salman, M.D., performed the evaluation. (R. 429). Subsequently, Plaintiff routinely sought psychiatric treatment from Dr. Salman. (See R. 427-29, 596-02). After experimenting with different medication regimens, Dr. Salman ultimately settled on a medication regimen of Buspar, Depakote and Lamictal for Plaintiff. (R. 596).

conditions. (R. 429). To treat this condition, she was started on prescriptions of Lamictal and Seroquel. (R. 429).

On October 25, 2012, Plaintiff presented to a new primary care provider, Kristen Moore, M.D., of Premier Medical Group. (R. 413). Plaintiff informed Dr. Moore that she "does not feel [Dr. Dubberke] understands fibromyalgia." (Id.). Plaintiff also informed Dr. Moore that she suffers from pain "everywhere" and that none of the medications she had previously tried had offered any relief. (Id.). After an examination, Dr. Moore recommended physical therapy, which Plaintiff refused. (R. 416). Dr. Moore also instructed Plaintiff that she could cease taking her medications after Plaintiff stated that she "doesn't want to take any." (Id.). However, when Plaintiff subsequently attempted to cease taking tramadol, she suffered from adverse effects and restarted the medication. (R. 406).

On November 7, 2012, Plaintiff returned to Dr. Dubberke's office. (R. 433). During this visit, Dr. Dubberke documented that Plaintiff "[is] having a lot of anger issues" but had started regular therapy sessions with a psychiatrist. (Id.). Dr. Dubberke explained that, while Plaintiff had not yet returned to work, she "gets very angry when she thinks about her job." (Id.). At the end of the visit, Dr. Dubberke again "strongly recommend[ed]" pool therapy, which Plaintiff continued to refuse. (Id.).

On November 26, 2012, Plaintiff presented to Dr. Moore's office, complaining that Dr. Dubberke was releasing her back to work on December 10, 2012, but that she "can't go back to work." (R. 410). Plaintiff requested a "[second] opinion from [a] rheumatolog[ist]," for which she received a referral. (R. 412). Dr. Moore repeated her recommendation of physical therapy, which Plaintiff stated she could not afford. (Id.).

Dr. Moore also noted that Plaintiff had been scheduled for a sleep study but missed the appointment. (Id.). As a result, Dr. Moore rescheduled the study. (Id.).

In January of 2013, Plaintiff presented to several different health care providers. On January 4, 2013, Kelly Nelson, M.D., of Bridgeport Express Care, prescribed Flexeril for Plaintiff's complaints of generalized pain. (R. 501-03). On January 18, 2013, Plaintiff presented to Kenneth N. Gold, M.D., of the University of Pittsburgh Medical Center's Arthritis and Autoimmunity Center. (R. 436, 495). Plaintiff informed Dr. Gold that she suffers from generalized pain, extreme fatigue and difficulty sleeping. (R. 436). Plaintiff stated that she initially believed her symptoms were caused by a thyroid impairment but that, after undergoing a partial thyroidectomy, the symptoms persisted. (Id.). After an examination, Dr. Gold prescribed Neurontin and Cymbalta for her symptoms. (R. 495). On January 23, 2013, Bill Dean Underwood, M.D., of WVU Healthcare's Department of Neurology, documented that an MRI of Plaintiff's thoracic spine revealed "numerous intraosseous hemangiomas" but that neurosurgical intervention was not "warranted at this time." (R. 478-79).

On February 27, 2013, Plaintiff presented to Gerald Farber, M.D., of United Hospital Center's Orthopaedics Department, complaining of numbness and tingling in her hands. (R. 445-46). After an examination, Dr. Farber diagnosed Plaintiff with "compressive nerve symptoms consistent . . . carpal tunnel syndrome." (R. 446). Dr. Farber instructed Plaintiff to apply splints to her upper extremities at night to prevent elbow flexion while she sleeps. (Id.). Dr. Farber also ordered nerve conduction studies, which revealed mild carpal tunnel syndrome. (R. 446-47). After reviewing the results of

the studies, Dr. Farber stated that he did not recommend carpal tunnel surgery "at this point in time." (R. 448).

On March 6, 2013, Plaintiff presented to WVU Healthcare's Department of Neurology for an evaluation of her fibromyalgia. (R. 480-84). Anil M. Patel, M.D., a resident physician, evaluated Plaintiff. (R. 480). Plaintiff informed Dr. Patel that her pain had been worsening over the past six to seven months and that her psychiatrist had recently diagnosed her with bipolar disorder. (R. 481). After examining Plaintiff, Dr. Patel recommended both pool and physical therapy. (R. 484). While Plaintiff refused to partake in pool therapy, she was "agreeable" to physical therapy. (Id.). Jo Ann Allen Hornsby, M.D., Dr. Patel's supervising physician, agreed that Plaintiff should participate in a "trial of non-pharmacologic measures such as [physical therapy], cognitive behavioral therapy or acupuncture." (Id.).

In early 2013, Adnan Alghadban, M.D., of Associated Specialists, Inc., evaluated Plaintiff's fibromyalgia and recommended that Plaintiff undergo trigger point injections to treat her neck pain and headaches, to which Plaintiff agreed. (R. 447). On April 12, 2013, Dr. Alghadban administered the injections, which Plaintiff tolerated "very well." (R. 450). On May 14, 2013, after Plaintiff continued to complain of headaches, Dr. Alghadban prescribed indomethacin and noted that he would administer more injections if Plaintiff found the medication ineffective. (R. 452). On July 23, 2013, Dr. Alghadban documented that the medication only "helped partially" and administered bilateral shoulder joint injections. (R. 453-54). Dr. Alghadban also prescribed Lyrica for Plaintiff's continuing complaints of pain. (R. 454). On August 20, 2013, Dr. Alghadban documented that Plaintiff was still suffering from headaches. (R. 455). Therefore, Dr.

Alghadban prescribed magnesium supplements and scheduled Plaintiff for Botox injections, which she received on September 26, 2013. (R. 455, 457). On November 19, 2013, Dr. Alghadban documented that, despite trying various preventive medications and nerve blocks, only Botox injections provided any significant relief for Plaintiff's pain. (R. 459). On November 22, 2013, Dr. Alghadban performed bilateral occipital nerve blocks on Plaintiff, which she tolerated well. (R. 460-61). On January 2, 2014, Dr. Alghadban noted that Plaintiff's medication regimen "seems to be helping" and informed Plaintiff that he intended "to continue with the same [pain] management [plan]." (R. 462).

In January of 2014, Plaintiff presented to Mountain State Rheumatology for an appointment with Dr. Kafka. (R. 475). During this visit, Dr. Kafka noted that Plaintiff suffers from fibromyalgia and back pain and prescribed Skelaxin, a muscle relaxant, to treat Plaintiff's pain. (R. 476). Dr. Kafka also ordered Plaintiff to participate in physical therapy and referred her to United Hospital Center's pain clinic for an evaluation of her back pain. (Id.).

On January 23, 2014, Plaintiff presented to the pain clinic for her back pain evaluation. (R. 485). Corinne Michel Layne-Stuart, D.O., performed the evaluation. (R. 490). After the evaluation, Dr. Layne-Stuart diagnosed Plaintiff with, *inter alia*, myofascial pain syndrome, left shoulder bursitis and very mild/early cervical spondylosis. (R. 489). Dr. Layne-Stuart noted that Plaintiff's treatment history included physical therapy, chiropractic manipulation, professional psychological support, oral steroids and other medications, all of which were ineffective. (R. 486). Therefore, to treat Plaintiff's conditions, Dr. Layne-Stuart ordered that Plaintiff undergo a left shoulder

subacromial bursa injection and trigger point injections to her upper thoracic and cervical regions, which were performed on February 4, 2014. (R. 489-90, 584-85). However, on February 17, 2014, when Plaintiff presented for a follow-up appointment, she continued to complain of severe headaches and left shoulder pain. (R. 490-93). As a result, Dr. Layne-Stuart ordered that Plaintiff undergo bilateral greater and lesser occipital nerve blocks, which were performed on February 18, 2014. (R. 581-83).

On April 2, 2014, Plaintiff returned to WVU Healthcare's Department of Neurology for an appointment with Dr. Underwood. (R. 562). During this appointment, Dr. Underwood ordered MRI scans of Plaintiff's spine to monitor her spinal hemangiomas. (Id.). While hemangiomas remained present on Plaintiff's spine, Dr. Underwood documented that "[t]he presence of hemangiomas are quite common on MRIs and I am not aware of a [related] pain syndrome unless they are expansile or result in fractures." (R. 562, 572-75).

### 3. Medical Reports/Opinions

#### a. Treating Source Statement by Lance Dubberke, M.D., October 8, 2012

On October 8, 2012, Lance Dubberke, M.D., Plaintiff's primary care physician, submitted a Treating Source Statement. (R. 397-98). In this statement, Dr. Dubberke declared that he has diagnosed Plaintiff with fibromyalgia. (R. 397). Dr. Dubberke further declared that Plaintiff's fibromyalgia symptoms first occurred on September 13, 2012. (Id.). Finally, Dr. Dubberke declared that, while he has not yet authorized Plaintiff to return to work, he expects to authorize her on November 8, 2012. (R. 398).

### b. Disability Determination Explanation by Porfirio Pascasio, M.D., November 13, 2012

On November 13, 2012, Porfirio Pascasio, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 79-86). Prior to drafting the Initial Explanation, Dr. Pascasio reviewed, *inter alia*, Plaintiff's medical records, treatment notes and Adult Function Report. (R. 80-82). After reviewing these documents, Dr. Pascasio concluded that Plaintiff suffers from severe fibromyalgia and non-severe thyroid gland disorders and affective disorders. (See R. 82-83, 93). Dr. Pascasio further concluded that Plaintiff's statements regarding her symptoms and limitations are only "[p]artially [c]redible." (R. 83).

In the Initial Explanation, Dr. Pascasio completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 84). During this assessment, Dr. Pascasio found that, while Plaintiff possesses no postural, manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional limitations. (Id.). Specifically, Dr. Pascasio found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (Id.). After completing the RFC assessment, Dr. Pascasio determined that Plaintiff is able to perform her past relevant work as a finance manager. (R. 85).

Also in the Initial Explanation, James W. Bartee, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. (R. 83). On this form, Dr.

Bartee opined that Plaintiff does not suffer from any "diagnosable mental impairment." (Id.).

### c. Treating Source Statement by Muhammad Salman, M.D., December 5, 2012

On December 5, 2012, Muhammad Salman, M.D., one of Plaintiff's treating physicians, submitted a Treating Source Statement. (R. 424-26). In the Treating Source Statement, Dr. Salman reported that he started treating Plaintiff on October 31, 2012, and that Plaintiff has presented to him a total of three times for "medication management." (R. 424). Dr. Salman further reported that he treats Plaintiff for a "mood [disorder] secondary to medical conditions," for which he prescribes Lamictal. (Id.). When asked to describe Plaintiff's functional limitations caused by her conditions, Dr. Salman stated that Plaintiff "reports [a history of, *inter alia*:] depression, fatigue, feel[ing] overstimulated, anhedonia, crying spells [and] poor memory." (Id.). At the end of the Treating Source Statement, Dr. Salman opined that Plaintiff does not suffer from any abnormal mental status findings. (R. 425).

### d. Disability Determination Explanation by Navjeet Singh, M.D., January 3, 2013

On January 3, 2013, Navjeet Singh, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 88-98). Prior to drafting the Reconsideration Explanation, Dr. Singh reviewed the same documents that Dr. Pascasio had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records. (R. 89-92). After reviewing these documents, Dr. Singh largely agreed with Dr. Pascasio's conclusions contained in the Initial Explanation. (See R. 82-86, 93-98). For

example, Dr. Singh agreed that Plaintiff does not possess from any manipulative, visual, communicative or environmental limitations. (R. 96). However, Dr. Singh dissented from some of Dr. Pascasio's conclusions regarding Plaintiff's exertional limitations. (See R. 84, 95-96). Specifically, Dr. Singh determined that Plaintiff is able to occasionally lift and/or carry twenty pounds, instead of fifty pounds, and frequently lift and/or carry ten pounds, instead of twenty-five pounds. (R. 95). Dr. Singh also dissented from Dr. Pascasio's conclusion that Plaintiff does not possess any postural limitations. (See R. 84, 95-96). Instead, Dr. Singh determined that, while Plaintiff may frequently climb ramps/stairs, stoop and kneel, she may only occasionally crouch, crawl and climb ladders/ropes/scaffolds. (R. 95-96).

Also in the Reconsideration Explanation, John Todd, Ph.D., a state agency psychologist, reviewed Dr. Bartee's Psychiatric Review Technique form from the Initial Explanation. (R. 94). Initially, Dr. Todd agreed with Dr. Bartee's conclusion that Plaintiff does not suffer from a mental medically diagnosable impairment. (Id.). Dr. Todd then analyzed the degree of Plaintiff's functional limitations. (Id.). Specifically, Dr. Todd rated Plaintiff's level of restriction in her activities of daily living as "mild." (Id.). Dr. Todd further rated Plaintiff's difficulties in maintaining social functioning and in maintaining concentration, persistence or pace as "none." (Id.). Finally, Dr. Bickham rated Plaintiff's episodes of decompensation as "none." (Id.).

### e. Medical Source Statement and Mental RFC Assessment by Rod McCullough, M.A., May 5, 2014[4]

On or about May 5, 2014, Rod McCullough, M.A., a licensed psychologist, submitted a Medical Source Statement and Mental RFC Assessment regarding Plaintiff. (R. 604-12). In his Medical Source Statement, Dr. McCullough declared that he had examined Plaintiff twice in April of 2013. (R. 604). Dr. McCullough further declared that he had reviewed the treatment notes of Drs. Dubberke and Alghadban. (Id.).

During his examinations of Plaintiff, Dr. McCullough performed several psychometric tests on Plaintiff, including the Wechsler Memory Scale – Third Edition and the Millon Clinical Multiaxial Inventory – Third Edition. (R. 604-05). After performing these tests and reviewing Plaintiff's records, Dr. McCullough stated that "[t]here is clear indication of, and treatment for, fibromyalgia." (R. 604). When summarizing the abnormal findings from his examinations of Plaintiff, Dr. McCullough further stated that:

> [Plaintiff] is experiencing a significant impairment in cognitive processing, specifically in the area of memory and concentration. While there is no indication of significant characterological tendencies, there is indication of mild anxiety and moderate depressive symptoms; which would include disturbance in concentration.

(R. 605-06). Finally, Dr. McCullough stated that Plaintiff's impairments are not likely to produce "good days" and "bad days" but "are chronic and consistent at this point." (R. 612).

In his Mental RFC Assessment of Plaintiff, Dr. McCullough initially noted that Plaintiff suffers from depressive, anxiety and cognitive disorders. (R. 610). Dr. McCullough then determined that Plaintiff possesses limitations in understanding and

---

[4] In the Treating Source Statement discussed *infra* at Part III.B.3.f, Dr. Nelson declared that he "fully agree[s]" with Dr. McCullough's Medical Source Statement and Mental RFC Assessment. (R. 614).

memory, sustained concentration and persistence, social interactions and adaptation. (R. 609-10). Regarding Plaintiff's limitations in understanding and memory, Dr. McCullough found that Plaintiff possesses a: (1) mild limitation in her ability to understand and remember very short, simple instructions; (2) moderate to moderately severe limitation in her ability to remember work-like procedures and (3) moderately severe limitation in her ability to understand and remember detailed instructions. (R. 609). Regarding her limitations in sustained concentration and persistence, Dr. McCullough found that Plaintiff possesses: (1) no limitation in her ability to sustain an ordinary routine without special supervision; (2) a mild limitation in her abilities to carry out very short and simple instructions and to make simple work-related decisions; (3) a moderate limitation in her abilities to work in coordination with or proximity to others without being distracted by them and perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances; (4) a moderate to moderately severe limitation in her ability to carry out detailed instructions and (5) a moderately severe limitation in her abilities maintain attention and concentration for extended periods of time and "complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without any unreasonable number and length of rest periods." (Id.).

Regarding her limitations in social interactions, Dr. McCullough found that Plaintiff possesses: (1) no limitation in her abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from superiors and maintain socially appropriate behavior and adhere to basic standards of nearness and cleanliness; (2) a mild limitation in her ability to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes and (3) a mild to moderate limitation in her ability to interact appropriately with the general public. (R. 610). Finally, regarding her limitations in adaptation, Dr. McCullough found that Plaintiff possesses: (1) no limitation in her abilities to be aware of normal hazards and take appropriate precautions and to set realistic goals or make plans independently of other of others; (2) a mild limitation in her ability to respond appropriately to changes in the work setting and (3) a moderate limitation in her ability to travel. (Id.).

### f. Treating Source Statement by Kelly Nelson, M.D., August 29, 2014

On August 29, 2014, Dr. Nelson submitted a Treating Source Statement on behalf of Plaintiff. (R. 614-15). In this statement, Dr. Nelson reported that he had treated Plaintiff "for many years" and that she suffers from "a number of medical conditions," including fibromyalgia, depression and degeneration of her left shoulder. (R. 614). Dr. Nelson then opined that Plaintiff "is unable to perform any type of gainful employment," including light work. (R. 614-15). Dr. Nelson explained that:

> [F]ibromyalgia is an unpredictable and ever changing condition. Finding that [Plaintiff] has the same unchanging capacity every single day is not consistent with her condition. Fibromyalgia symptoms vary in intensity and frequency. It may affect one part of the body one day and a different part the next day. There are often flare ups and then periods of decreased symptoms. [Plaintiff] would not have the same ability each day. . . .

(R. 614). Dr. Nelson further opined that Plaintiff is credible regarding the severity of her symptoms and impairments, reasoning that "[i]t is [not logical] to believe [Plaintiff] just quit [her job, where she was very successful,] to be unemployed and receive meager disability benefits." (Id.).

**C.    Testimonial Evidence**

During the administrative hearing on May 7, 2014, Plaintiff detailed her work history. Most recently, Plaintiff has worked as a finance manager for Toyota World. (R. 37). As a finance manager, Plaintiff "was in charge of everything [in the finance office]. The money coming in. They money going out. The loans . . . . All [of] the paperwork." (Id.). Plaintiff ceased working as a finance manager in August of 2011, after she underwent sinus surgery. (Id.). Plaintiff explains that, after her surgery, she became ill and "just didn't bounce back from it." (R. 38). Although her shifts were reduced from eight- to ten-hour shifts to approximately five-hour shifts, Plaintiff felt too exhausted to work. (R. 51). Therefore, she accepted three months of short-term disability benefits. (R. 39). However, after the three months expired, she "just didn't [feel] any better. . . . [T]hat's when [she] told [her employer she] wasn't coming back." (R. 38).

Plaintiff testified that she suffers from physical impairments, including headaches and fibromyalgia. (R. 43). Regarding her headaches, Plaintiff states that she has "always had a lot of headaches." (R. 46). She estimates that she has a headache every day. (Id.). The headaches cause light/noise sensitivity. (R. 42). Regarding her fibromyalgia, Plaintiff was diagnosed with the condition after she ceased working for Toyota World. (R. 38, 43). Plaintiff states that her fibromyalgia causes her to "hurt all over." (See R. 38). It also causes her to feel stiff in the morning. (R. 50). She explains:

> [T]he morning times are super hard, because I'm so stiff, and I hurt so bad in the mornings. . . . I never know what time I'm able to get going. So many times I can't even get up and get dressed until noon.

(Id.). To treat her fibromyalgia symptoms, Plaintiff has sought care from a rheumatologist and orthopedist and has received injections in her left shoulder, which

"didn't work." (R. 43). Although pool/aquatic therapy was recommended, Plaintiff refused the therapy because she is "very insecure about [her] body." (R. 46).

In addition to physical impairments, Plaintiff testified that she suffers from mental impairments. Plaintiff states that she suffers from memory loss and confusion. (R. 44). She further states that she suffers from difficulty sleeping at night and that, as a result, she falls asleep frequently throughout the day. (R. 45). She also suffers from depression, for which takes Cymbalta, which she declares "helps." (R. 45, 53). Finally, Plaintiff states that she suffers from social anxiety and that she does not participate in social activities. (R. 42, 50). For treatment of her mental symptoms, Plaintiff has sought care from a psychiatrist and participates in therapy sessions. (R. 39-40).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

James W. Primm, an impartial vocational expert, also testified during the administrative hearing. (R. 54-61). Initially, Mr. Primm testified regarding the characteristics of Plaintiff's past relevant work. (R. 55). Specifically, Mr. Primm characterized Plaintiff's work as a finance coordinator as sedentary and skilled. (Id.).

The ALJ then presented several hypothetical questions for Mr. Primm's consideration. In the first hypothetical question, the ALJ asked:

> [A]ssume a hypothetical individual with the past job you just described. Further assume the individual is limited to work at the light exertional level, except the work is with occasional posturals, except no crawling or climbing of ladders, ropes or scaffolds.
>
> Can the hypothetical individual perform the past job you described as actually performed or generally performed in the national economy?

(Id.). Mr. Primm testified in the affirmative and further testified that such an individual could also work as a fund raiser, information clerk and ticket seller. (R. 56). The ALJ then repeated his question with the additional limitation that the hypothetical individual have no concentrated exposure to fumes, odors, dusts, gases or poor ventilation. (Id.). Mr. Primm responded that such an individual could still perform the same four jobs. (R. 56-57). The ALJ then added the limitation that the hypothetical individual be able to perform only simple, routine and repetitive tasks. (R. 57). Mr. Primm responded that, while such an individual could not work as a finance coordinator, the individual could still work as a fund raiser, information clerk and ticket seller. (Id.). The ALJ then added the limitation that the hypothetical individual only interact occasionally with supervisors, coworkers and the public. (Id.). Mr. Primm responded that such an individual could not work as a fund raiser, information clerk or ticket seller but could work as a "non Postal mail clerk," garment sorter and "inspector, hand packer." (R. 57-58).

The ALJ then presented a second hypothetical question to Mr. Primm. Specifically, the ALJ asked Mr. Primm to:

> [C]onsider a hypothetical individual who is limited to work at the sedentary exertional level, except the work is with occasional postural, except no crawling or climbing of ladders, ropes or scaffolds.
>
> Can the hypothetical individual perform the past job you classified of finance coordinator?

(R. 58). Mr. Primm testified that such an individual could perform Plaintiff's past work as a finance coordinator. (Id.). The ALJ then repeated his question with the additional limitation that the hypothetical individual only be able to perform simple, routine and repetitive tasks and, without working at a "production rate pace," perform goal-oriented

work. (Id.). Mr. Primm responded that such an individual could not work as a finance coordinator. (R. 59).

The ALJ then asked Mr. Primm several non-hypothetical questions. First, the ALJ asked how long an individual may be off task during a workday. (Id.). Mr. Primm testified that an individual may be off task for ten percent of the workday and that, if the individual exceeds this amount of time, he or she would be unable to maintain full-time employment. (Id.). Second, the ALJ asked how many unexcused or unscheduled absences employers typically tolerate from their employees. (Id.). Mr. Primm testified that employers typically allow no more than one such absence per month. (Id.). Third, the ALJ how many routine "rest or break periods" employers typically permit. (Id.). Mr. Primm testified that employers typically allow "a 10 to 15-minute morning and afternoon break, with a lunch hour ranging anywhere from 30 to 60 minutes." (Id.). Mr. Primm further testified, however, that he has "also known employers just to provide a 30 to 60-minute lunch break" with no additional breaks throughout the day. (Id.). After answering the ALJ's questions, Mr. Primm stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Id.).

Plaintiff's counsel, Mr. Miller, also presented questions for Mr. Primm's consideration during the administrative hearing. (R. 60-61). First, Mr. Miller asked Mr. Primm to consider:

> [A hypothetical] person . . . [who is limited] in the areas of maintaining attention and concentration for extended periods of time and . . . in the ability to complete a normal workday and work week, without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. . . . ["Limited" is] defined as follows, the person is able to perform the designated task or function, but has or will have noticeable difficulty, meaning that the person would be distracted from the job activity more than 20 percent of the

workday or work week. . . . [W]ould [those two limitations] have any effect
on the work that you've discussed here today."

(R. 60). Mr. Primm opined such a person would not be employable in any capacity. (R.

60-61). Second, Mr. Miller asked:

[H]ow important is reliability? And what I mean by reliability is the
hypothetical worker showing up at the designated start of the work shift,
staying at the job until the lunch period, coming back [at] the end of the
lunch period and staying there at working until the end of the work shift at
the end of the day.

(R. 61). Mr. Primm opined that reliability "is a critical component [in] maintain[ing] full-

time employment" and that, if a worker is not reliable, "[it is] unlikely [that he or she will]

be able to sustain full-time work." (Id.).

### 2. Disability Reports

On an undated Disability Report submitted by Plaintiff, Plaintiff indicated that she

is unable to work. (R. 183-93). Specifically, Plaintiff indicated that she is unable to work

due to the following impairments: (1) fibromyalgia; (2) chronic fatigue syndrome; (3)

depression; (4) hypothyroidism; (5) anxiety; (6) muscle spasms; (7) memory fog; (8)

vertigo; (9) bilateral carpal tunnel syndrome and (10) lower back and shoulder pain. (R.

184). Plaintiff further indicated that she stopped working on August 20, 2012. (R. 184-

85). Plaintiff explained that she stopped working because:

I had Sinus Surgery on 09/21/2012. I was having much difficulty working
my normal shifts. I was unable to function [within] my normal limits, and
the pain was unbearable. I could not take anything to help with the pain,
and be able to drive home. . . .

(R. 185). Although Plaintiff stopped working on August 20, 2012, Plaintiff stated that she

believes her impairments became severe enough to keep her from working on April 1,

2011. (Id.). After stating that she is receiving treatment for both physical and mental

conditions, she listed amitriptyline, amoxicillin, Cymbalta, Dexilant, hydrocodone, Premarin, Synthroid and zolpidem as her prescribed medications. (R. 187).

Plaintiff's counsel Mr. Miller submitted two Disability Report-Appeal forms on behalf of Plaintiff. (R. 212-16, 220-24). On November 29, 2012, Mr. Miller reported that, since filing her last report, Plaintiff had started experiencing bilateral hand pain and occasional numbness in her hands and face. (R. 212). Mr. Miller stated that, as a result of her bilateral hand pain and numbness, Plaintiff has difficulty grasping items. (Id.). Mr. Miller also reported that Plaintiff's headaches are more frequent and "worse" and that her mood "continues to get worse." (Id.). Mr. Miller estimated that these changes occurred on October 15, 2012. (Id.). On January 14, 2013, Mr. Miller reported that Plaintiff's activities of daily living remain "very limited." (R. 223). He also updated Plaintiff's list of prescribed medications to the following: zolpidem, Flexeril, Lamictal, perphenazine, Premarin, Synthroid, topiramate, tramadol and Treximet. (R. 222).

**E.    Lifestyle Evidence[5]**

On October 5, 2012, Plaintiff submitted an Adult Function Report. (R. 194-01). In this report, Plaintiff states that she is unable to work because:

> I find it hard to sit for more than 20 minutes, stand 15 minutes. My body aches and hurts so much I cannot concentrate, [lose] thoughts, memory fog, feel so tired and fatigued to keep myself going. I'm afraid to drive a vehicle alone. I do not sleep well at night, but feel exhausted after waking. Feel very [agitated] with people, noises. If I am talking, and stop or am interrupted, I cannot remember what I was discussing. My spouse said he has noticed my understanding or explanation of things are much more strained. My sleep is not refreshed even after 15 [hours]. The normal activities are impossible for me to do, take much more time, or many breaks are needed. I can best express myself as a puppet, where the

---

[5] In addition to the following records, Plaintiff submitted letters from her sister, Vicki L. Beck, and from Dan Cava, her former employer, in support of her claim for DIB. (R. 226-27, 240). Plaintiff uses these letters primarily to reinforce her statements regarding her symptoms and limitations. (See id.).

strings have been cut and I have fallen to the floor with no way to move or get up. Headaches are everyday, stress makes them worse.

(R. 195, 201).

Plaintiff discloses that she is limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to perform her own personal care. (R. 195). She is able to care for her pet dogs, although her husband assists with all pet care. (Id.). She is able to shop in stores and online, as well as via the phone or mail. (R. 197). She is able to separate laundry into different piles and prepare meals, although her husband "does most [of the] cooking." (R. 196). While it makes her "uncomfortable," she is able to operate a motor vehicle.[6] (R. 197). She is able to pay bills and count change. (Id.).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her physical and mental impairments. Regarding her physical impairments, Plaintiff's conditions affect her physical abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs and use her hands. (R. 199). She explains that she experiences difficulty lifting items weighing more than "5 to 7 pounds" and that she is only able to walk for one to two blocks before requiring a "few moments" of rest. (Id.).

Regarding her mental impairments, Plaintiff states that her pain causes her to suffer from depression, anxiety, anger, exhaustion and confusion. (R. 198). As a result, Plaintiff's impairments affect her mental abilities to: retain information, complete tasks, concentrate, comprehend new information, follow instructions and get along with others. (R. 199). She explains that she experiences difficulty getting along with others because:

---

[6] Plaintiff testified during the administrative hearing that she drives "maybe twice a week." (R. 49).

I am vocal, not shy, and tell my opinions up front. I take up for myself if
needed. People judge [me] because they can't see my pain.

(Id.). She further explains that she does not handle stress or changes to her routine

well. (R. 200). Due to her physical and mental limitations, Plaintiff experiences difficulty

sleeping and is no longer able to babysit or play with her grandchildren, although she

does talk with them during their occasional visits to her home. (R. 195, 198).

Finally, Plaintiff details her routine activities. Each day, Plaintiff awakens, feeds

her pet dogs and lets them outside, drinks a cup of coffee and washes her face. (R.

195). She then sits in a recliner "to try to loosen up." (Id.). Sometimes, she gets

dressed, although "most [days she] remain[s] in stretch pants for comfort." (Id.). She

sleeps "a lot" throughout the day. (Id.). At the end of the day, she waits for husband to

come home from work, cleans up dishes and watches television. (Id.). At some point

during the day, she takes her prescribed medications.[7] (See R. 201). Once a week, she

goes shopping. (R. 197). From April to October, Plaintiff goes camping "on a regular

basis."[8] (R. 198).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

_____

[7] On an undated form entitled "Claimant's Medications," Plaintiff states that her daily
medications include: (1) Buspar for anxiety; (2) gabapentin for pain; (3) Skelaxin to relax her
muscles; (4) topiramate to prevent headaches; (5) Premarin for replacement hormones; (6)
Synthroid for thyroid regulation; (7) Restoril for sleep; (8) Depakote to "slow [her] thoughts
down;" (9) Lamictal to stabilize her mood; (10) Cymbalta for pain/depression; (11) Treximet for
migraines; (12) low-dose aspirin for heart health and (13) several vitamins for various
deficiencies. (R. 228). During the administrative hearing, Plaintiff testified that her daily
medications cause loose stools, "stomach problems," leg cramps and weight gain. (R. 46).
    [8] Plaintiff estimates that, in the past during these months, she went camping every other
weekend. (R. 198). While camping, Plaintiff enjoyed "relax[ing], swing[ing and] rid[ing] in a golf
cart." (Id.). However, in an addendum to this Adult Function Report dated December 12, 2012,
Plaintiff declares that she "ha[s the] camp [up] for sale because riding in car (1 hour) up to camp
and on [the] golf cart is painful and makes [her] body hurt more." (R. 208).

[The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following

five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four,

the burden is on the claimant to prove that he or she is disabled and that, as a result of

the disability, he or she is unable to engage in any gainful employment. <u>Richardson v. Califano</u>, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. <u>Hicks v. Gardner</u>, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.     <u>ALJ'S DECISION</u>

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.     The claimant has not engaged in substantial gainful activity since August 20, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: fibromyalgia and depression (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.     The undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) that: requires no more than occasional postural, except no crawling or climbing of ladders, ropes, or scaffolds; avoids concentrated exposure to[ ] fumes, odors, dusts, gases, poor ventilation; is limited to simple[,] routine and repetitive tasks; requires no production rate pace but can perform goal oriented work; and involves no more than occasional interaction with supervisors, coworkers, and the public.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 30, 1962[,] and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 20, 2012, through the date of this decision (20 CFR 404.1520(g)).

(R. 21-28).

# VI.     DISCUSSION

## A.     Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision contains errors of law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ: (1) improperly evaluated Plaintiff's fibromyalgia at step two; (2) failed to consider relevant evidence at step two; (3) failed to account for all of Plaintiff's limitations when presenting hypothetical questions to the vocational expert and when determining Plaintiff's RFC and (4) improperly assessed Plaintiff's credibility. (Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 1, ECF No. 10). Plaintiff requests that the Court remand the case for the calculation of benefits or, in the alternative, remand the case for further proceedings. (Pl.'s Mot at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that: (1) substantial evidence supports the ALJ's decision that Plaintiff is not disabled; (2) the ALJ accounted for Plaintiff's mental limitations in the RFC and (3) the ALJ reasonably found Plaintiff's complaints not fully credible. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 5, 9, 12, ECF No. 12). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.      Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640,

642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

## C.     Analysis of the ALJ's Decision

### 1.   Whether the ALJ Properly Evaluated Plaintiff's Fibromyalgia

Plaintiff contends that the ALJ failed to properly evaluate her fibromyalgia at step two. (Pl.'s Br. at 5). Specifically, Plaintiff contends that the ALJ failed to follow the requirements of SSR 12-2p, 2012 WL 3104869 (July 25, 2012). (Id.). Defendant argues that the ALJ's step two determination is supported by substantial evidence. (See Def.'s Br. at 5-9).

At step two of the sequential evaluation process, a claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D. W. Va. 2009). SSR 12-2P details, _inter alia_, the evidence that a claimant must show for an ALJ to determine that he or she suffers from fibromyalgia. SSR 12-2P, 2012 WL 3104869 at *2. Under SSR 12-2P, two sets of criteria exist for diagnosing fibromyalgia. Id. Under the first set of criteria, a claimant must prove that he or she has all of the following:

> 1. A history of widespread pain—that is, pain in all quadrants of the body (right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.
>
> 2. At least 11 positive tender points on physical examination . . . . The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist. . . .

3. Evidence that other disorders that could cause the symptoms or signs were excluded. . . .

Under the second set of criteria, a claimant must prove that he or she has all of the following:

1. A history of widespread pain . . . ;

2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded . . . .

Id. at *2-3.

However, when proving that he or she suffers from a medically determinable impairment, a claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D. W. Va. 2015) (citations omitted). After such a showing, an impairment will be considered severe when, either by itself or in combination with other impairments, it "significantly limits [a claimant's] physical or mental abilit[ies] to [perform] basic work activities." Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920). Conversely, an impairment will be considered "'not severe' . . . if it [constitutes] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with [basic work activities]." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis removed). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such

as walking and standing. 20 C.F.R. § 404.1521 (1985).

In the present case, the undersigned finds that, if the ALJ committed any error at step two, the error was harmless in nature. At step two, the ALJ determined that Plaintiff suffers from two severe impairments, fibromyalgia and depression, and a multitude of non-severe impairments, including "headaches, chronic sinusitis, hypothyroidism, mild bilateral [carpal] tunnel syndrome, benign hemangiomas on the thoracic spine, mild retrolisthesis of L1, mild facet degenerative change of the cervical spine, and left shoulder bursitis." (R. 21-22). When explaining his reasoning for finding Plaintiff's fibromyalgia severe in nature, the ALJ stated:

> As to [Plaintiff's] fibromyalgia, while there are diagnoses of [it] in the record and [Plaintiff] is prescribed medications used to treat fibromyalgia, the objective requirements needed to establish this impairment are not contained in the evidence (Exhibits B1A and B9F). In order to find a medically determinable impairment of fibromyalgia, the record must contain: 1) a history of wide spread pain . . . ; 2) at least 11 positive tender points on physical examination . . . ; and 3) evidence that other disorders that could cause the symptoms or signs were excluded (SSR 12-2p). This was not met because there are no examinations that establish at least 11 positive tender points on physical examination. However, [Plaintiff] can also be found to have fibromyalgia if[:] 1) there is a history of wide spread pain (as noted above); 2) there [are] repeated manifestations of fatigue, cognitive or memory problems, waking un-refreshed, depression, anxiety, or irritable bowel syndrome; and 3) evidence that other disorders that could cause the symptoms or signs were excluded (SSR 12-2P). Although not specifically met in the evidence, the undersigned has given [Plaintiff] the benefit of the doubt that fibromyalgia is a [severe] medically determinable impairment.

(Id.). Therefore, the ALJ used the proper criteria set forth in SSR 12-2P when determining whether Plaintiff suffered from fibromyalgia and whether it was severe in nature.

Plaintiff argues that the ALJ erred as a matter of law when he stated that the record did not contain the evidence needed to establish a diagnosis of

fibromyalgia yet determined that Plaintiff's fibromyalgia constitutes a severe impairment. (Pl.'s Br. at 6). The undersigned finds that this argument lacks merit. Initially, the undersigned notes that Plaintiff is not contesting the ALJ's ultimate conclusion, only his reasoning in arriving at the conclusion. While Plaintiff may wish that the ALJ had used a different line of reasoning, Plaintiff's desired line of reasoning would not have changed the ALJ's ultimate conclusion. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir.1994) (holding that remand is unnecessary, despite an ALJ's initial error, when the ALJ would have reached the same result notwithstanding his error). Moreover, any error on the part of the ALJ at step two is harmless so long as the ALJ "continued through the remaining steps [of the evaluation process] and considered all of the claimant's impairments." Pierce, 2015 WL 136651, at *19. Consequently, any error on the part of the ALJ in the present case is harmless in nature.[9]

### 2. Whether the ALJ Considered all Relevant Evidence

Plaintiff argues that the ALJ "failed to [consider] and discuss clearly relevant evidence that contradicted his finding regarding the fibromyalgia diagnosis [at step two]." (Pl.'s Br. at 9). Defendant argues that, while the ALJ may not have discussed all of the evidence of record, his conclusions are supported by substantial evidence. (Def.'s Br. at 5-9).

---

[9] Similarly, Plaintiff argues that the ALJ's reasoning was flawed because "the record contained voluminous evidence establishing the diagnosis of fibromyalgia." (Pl.'s Br. at 7). The undersigned finds that this argument also lacks merit. The ALJ concluded that Plaintiff's fibromyalgia was a severe impairment and would have reached that same conclusion if he had used Plaintiff's preferred line of reasoning. Consequently, any error on the part of the ALJ is harmless in nature. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir.1994) (holding that remand is unnecessary, despite an ALJ's initial error, when the ALJ would have reached the same result notwithstanding his error).

An ALJ is required to *consider* all of the relevant medical evidence submitted by a claimant. 20 C.F.R. § 416.920. However, an ALJ is "not obligated to *comment on* every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Instead, an ALJ's decision need only "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). In other words, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015). Therefore, if an ALJ states that the "whole record was considered, . . . absent evidence to the contrary, we take [him] at [his] word." Reid, 769 F.3d at 865.

In the present case, the undersigned finds that the ALJ considered all of the relevant evidence when he determined that Plaintiff's fibromyalgia constitutes a severe impairment. In his decision, the ALJ stated that he had carefully considered the entire record when proceeding through the five-step evaluation process. (R. 21). The ALJ then re-iterated at step two that he had considered the entirety of the record when determining that Plaintiff's fibromyalgia is severe in nature. (See R. 21-22) (stating that he had considered "the evidence" when determining whether Plaintiff suffers from fibromyalgia). Because no evidence exists to refute the ALJ's statements, the undersigned will accept these statements as true.

The undersigned further finds that the ALJ sufficiently discussed the relevant medical evidence and his reasons for determining that Plaintiff's fibromyalgia constitutes a severe impairment. When determining whether Plaintiff's fibromyalgia is severe in nature, the ALJ stated:

> As to [Plaintiff's] fibromyalgia, while there are diagnoses of [it] in the record and [Plaintiff] is prescribed medications used to treat fibromyalgia, the objective requirements needed to establish this impairment are not contained in the evidence. . . . Although not specifically met in the evidence, the undersigned has given [Plaintiff] the benefit of the doubt that fibromyalgia is a [severe] medically determinable impairment."

(R. 21-22) (internal citations removed). Because the undersigned is able to follow the ALJ's reasoning, the ALJ provided the level of analysis required of him, minimal though it may be. Moreover, as previously stated in Part VI.C.1, any error on the part of the ALJ at step two is harmless in nature because the ALJ ultimately found in Plaintiff's favor at step two and continued to move through the remaining steps of the sequential evaluation process while keeping Plaintiff's fibromyalgia in mind. Consequently, the undersigned finds that Plaintiff's contention that the ALJ failed to consider and discuss all of the relevant medical evidence is without merit.

### 3.  Whether the ALJ Accounted for all of Plaintiff's Limitations

Plaintiff contends that the ALJ failed to consider all of her physical and mental limitations when presenting hypothetical questions to the vocational expert and when determining Plaintiff's RFC. (Pl.'s Br. at 10). Specifically, Plaintiff contends that the ALJ failed to account for the variability[10] of fibromyalgia and Plaintiff's memory and concentration deficits.

The undersigned will first examine Plaintiff's contention that the ALJ failed to

---

[10] Plaintiff explains that Plaintiff's physical condition and abilities vary from day to day and that the RFC "provides for a static ability every single day." (Pl.'s Br. at 10).

consider the variability of fibromyalgia and Plaintiff's memory and concentration deficits in his hypothetical questions to the vocational expert. When asking a vocational expert a hypothetical question, the ALJ must initially establish the parameters of the claimant's RFC for the vocational expert. See Farnsworth, 604 F. Supp. 2d at 852-53, 858. In doing so, the ALJ must fairly set out all of the claimant's severe impairments that are supported by the record. Farnsworth, 604 F. Supp. 2d at 852-53, 858. Therefore, if the claimant suffers from a severe impairment that causes physical or mental limitations, then the hypothetical question must properly illustrate those limitations. See Mascio v. Colvin, 780 F.3d 632, 637-38 (4th Cir. 2015). However, the ALJ need not set out the claimant's non-severe impairments.[11] Farnsworth, 604 F. Supp. 2d at 858.

In the present case, the undersigned finds that the ALJ presented sufficient hypothetical questions to the vocational expert. In his first hypothetical question, the ALJ asked the vocational expert to:

> [A]ssume a hypothetical individual with the past job you just described. Further assume the individual is limited to work at the light exertional level, except the work is with occasional postural, except no crawling or climbing of ladders, ropes or scaffolds.

The ALJ then added the following limitations to the hypothetical individual: (1) must have no concentrated exposure to fumes, odors, dusts, gases or poor ventilation; (2) can perform only simple, routine and repetitive tasks and (3) only interact occasionally with supervisors, coworkers and the public. This hypothetical question fairly set out all of Plaintiff's severe impairments. While Plaintiff argues that the ALJ did not account for the variability of fibromyalgia,

---

[11] The undersigned emphasizes that, while an ALJ need not set out all of a claimant's non-severe impairments to the vocational expert, the ALJ must still consider those non-severe impairments when determining the claimant's RFC. See Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *6 (N.D. W. Va. Jan. 28, 2015).

"variability" is not a limitation and Plaintiff does not assert any actual physical limitation supported by the record that the ALJ failed to include in his hypothetical questions. Moreover, the ALJ accounted for Plaintiff's memory and concentration deficits in his first hypothetical question by limiting the hypothetical individual to simple, routine and repetitive tasks. See infra pp. 39-40 (explaining why the limitation of simple, routine and repetitive tasks adequately accounts for Plaintiff's memory and concentration deficits).

Next, the undersigned will examine Plaintiff's contention that the ALJ failed to consider the variability of fibromyalgia and Plaintiff's memory and concentration deficits in the RFC. The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946(a) (2011); Farnsworth, 604 F. Supp. 2d at 835. The RFC is what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). More specifically, the RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)." Dunn v. Colvin, 607 F. App'x 264, 272 (4th Cir. 2015). An RFC assessment requires an ALJ to consider "all the relevant evidence" in the record. 20 C.F.R. § 404.1545(a)(1). Therefore, an ALJ must consider both severe and non-severe impairments. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *6 (N.D. W. Va. Jan. 28, 2015).

In the present case, the undersigned finds that the ALJ properly accounted for Plaintiff's physical and mental limitations in the RFC. Plaintiff argues that the RFC provides for a static ability when Plaintiff's abilities change depending on whether she is

having a good or bad day. However, Plaintiff misunderstands what the RFC represents. An RFC "is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996) (emphasis in original). Therefore, the ALJ's RFC determination represents the utmost that Plaintiff is capable of performing and does not need to address the fact that her abilities may change depending on whether she is having a good or bad day.

Plaintiff further argues that the ALJ failed to account for her memory and concentration deficits in the RFC. (Pl.'s Br. at 11-12). The undersigned disagrees. Plaintiff relies on Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) to support her contention that the ALJ failed to address her memory and concentration deficits. (Id.). In Mascio, the Fourth Circuit held that an ALJ's boilerplate language of "simple, routine and repetitive tasks" in an RFC determination failed to account for the plaintiff's moderate difficulties in maintaining concentration, persistence or pace. Mascio, 780 F.3d at 638. However:

> [T]he Fourth Circuit was concerned that the ALJ did not explain why [the plaintiff's] moderate limitation in concentration, persistence, or pace at step three did not translate into a [specific, non-boilerplate] limitation in [the plaintiff's RFC at step four]. The Fourth Circuit noted, however, that the ALJ may find that the concentration, persistence, or pace limitation would not affect [the plaintiff's] ability to work, in which case it would have been appropriate to exclude it from the [RFC]. In Mascio, however, the ALJ gave no explanation whatsoever.

Hutton v. Colvin, No. 2:14-CV-63, 2015 WL 3757204, at *3 (N.D. W. Va. June 16, 2015).

In the present case, the ALJ found that Plaintiff "does have some limitation in memory [and] concentration" but that the evidence supports her ability to perform simple, routine and repetitive tasks. (R. 26). However, unlike in Mascio, the ALJ

explained why Plaintiff's limitation in memory and concentration would not affect her ability to work. Specifically, the ALJ noted, *inter alia*, that:

> [Plaintiff] reported activities, such as driving, preparing easy meals, shopping in stores and by computer, and visiting with grandchildren that support an ability to interact appropriately with others, and some ability to concentrate and complete tasks.

(Id.). The ALJ thus reasoned that, if Plaintiff was capable of performing such activities despite her limitation in memory and concentration, then her limitation would not affect her ability to work. (See id.). Therefore, unlike in Mascio, the ALJ provided sufficient reasoning for a reviewing court to conduct a meaningful review of his decision. Consequently, the ALJ's determination to limit Plaintiff's RFC to simple, routine and repetitive tasks is supported by substantial evidence.

### 4.  Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ erred in determining that Plaintiff is "not entirely credible" because the "ALJ did not believe [Plaintiff] had even established a proper diagnosis of her main disabling impairment" and, therefore, "could not have believed [Plaintiff's] symptoms [were] as severe as she alleged if he did not believe she had established the existence of the impairment causing the symptoms." (Pl.'s Br. at 12). Additionally, Plaintiff argues that the ALJ's supportive reasoning was either legally improper or factually inaccurate. (Id.). Defendant argues that the ALJ reasonably determined that Plaintiff's complaints were not fully credible and that the credibility determination is supported by substantial evidence. (Def.'s Br. at 12).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 24). Initially, the ALJ determined that Plaintiff had proved that she suffers from medical impairments capable of causing "some of the alleged symptoms." (Id.). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statement[s] concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (Id.).

### i. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making his credibility determination. The ALJ noted that, in her Adult Function Report, Plaintiff states that she ambulates independently, "cares for pets, prepares easy meals, separates laundry, drives, shops in stores and by computer, visits with grandchildren, camps in the summer, and rides on a golf cart." (R. 24-25). The ALJ then stated that

"[t]hese activities do not appear significantly limited and, absent any objective medical findings that offer convincing support for her impairment-related claims, undermine her credibility as to the severity of her symptoms." (R. 24).

Plaintiff argues that the ALJ grossly misrepresented the contents of Plaintiff's Adult Function Report and improperly selectively cited to it. (Pl.'s Br. at 13). The undersigned disagrees. Plaintiff does not dispute the validity of the information the ALJ cited. Furthermore, the ALJ fairly illustrated Plaintiff's daily activities as she reported them in the Adult Function Report and was not required to exhaustively comment on all of the evidence of record.[12] See Part VI.C. 2 (stating that an ALJ is "not obligated to comment on every piece of evidence presented"). Therefore, Plaintiff's argument is without merit.

### ii.    Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff complains of chronic pain, myalgias and fatigue, as well as depression and memory loss. (R. 24-25). The ALJ also noted that Plaintiff has exhibited edema, tenderness and a limited range of motion in her neck during physical examinations. (R. 25). After noting her symptoms, the ALJ recorded that Plaintiff "has not been hospitalized" for her symptoms, suggesting that they are not as severe as she alleges. (Id.).

---

[12] Plaintiff cites to Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006) to support her contention that the ALJ was required to discuss all evidence contrary to his decision. (Pl.'s Br. at 13-14). In Hines, however, the Court held that an ALJ had erred when determining the plaintiff's RFC because the RFC was "contradicted by undisputed evidence." Hines, 453 F.3d at 566. Therefore, Hines is factually distinguishable from the instant case.

Regarding factors that precipitate/aggravate those Plaintiff's symptoms, the ALJ documented that the more fatigued Plaintiff feels, the more her mental ability is affected. (See id.). The ALJ further documented that being around other people worsens her mental symptoms. (See id.).

### iii.  Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for her symptoms (factor four). Initially, the ALJ noted that Plaintiff "was prescribed [various] medications by [several] primary care physicians." (Id.). The ALJ then specifically noted that a rheumatologist had prescribed tramadol to Plaintiff for her pain. (Id.).

### iv.  Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of her symptoms (factor five) as well as measures Plaintiff uses to relieve her symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received for her symptoms, the ALJ noted that Plaintiff had received trigger point injections and nerve blocks from a neurologist to treat her pain, which she reported made her pain "better." (Id.). The ALJ further noted that Plaintiff participates in therapy to control her mental symptoms. (Id.). Nevertheless, the ALJ noted that, despite receiving treatment from multiple physicians, "there is no indication that . . . [any of her] primary care physician[s] excused her from work activity, as she reported that she had to quit." (Id.). As for measures Plaintiff uses to relieve her symptoms on her own, the ALJ noted that Plaintiff attempts to limit her physical activity and avoids interacting with others. (See R. 24-25).

### v.    Plaintiff's Work History

An additional factor that the ALJ considered when assessing Plaintiff's credibility

is her work history. Specifically, the ALJ noted that:

> [Plaintiff] was on short-term disability for three months due to her
> symptoms, but her primary care physician released her back to work and
> no other treating physician has said she is unable to work. After being
> released back to work, she quit without any attempt to resume her duties.
> Further, she told her primary care physician that [she] got 'angry' when
> she thought about her job and got 'stressed out' because of problems
> there, suggesting to the undersigned there may have been another reason
> she quit that job.

(R. 24). The ALJ then stated that "[t]hese facts, absent any objective medical findings

that offer convincing support for her impairment-related claims, undermine her credibility

as to her motivation in not returning to work, her actual limitation, and the severity of her

symptoms." (Id.).

Plaintiff argues that the ALJ erred in stating that her primary care physician had

released her back to work. (Pl.'s Br. at 13). Plaintiff explains that her primary care

physician had only *expected* to release her back to work on November 8, 2012, but that

"[t]here is no indication in the record whether or not [she] was ever [actually] released

back to work." (Id.). The undersigned notes that Dr. Dubberke did document that he

expected to release Plaintiff back to work on November 8, 2012, but that Plaintiff

changed primary care providers before Dr. Dubberke could officially release her. (R.

398, 410). However, it is clear that any error on the part of the ALJ does not render his

otherwise thorough and well-reasoned credibility determination improper. See Mickles,

29 F.3d at 921 (4th Cir.1994) (holding that remand is unnecessary, despite an ALJ's

initial error, when the ALJ would have reached the same result notwithstanding his

error). Therefore, the undersigned finds that any error was harmless in nature and that

Plaintiff's argument lacks merit.

Plaintiff further argues that the ALJ erred in stating that "there may have been another reason she quit her job," contending that this is a "patently false" statement. (Pl.'s Br. at 13). The undersigned disagrees. An ALJ is permitted to draw reasonable inferences from the evidence of record. See McCall v. Apfel, 47 F. Supp. 2d 723, 731 (S.D. W. Va. 1999) (stating that, if juries would be permitted to draw an inference from the evidence, then "surely ALJs must be afforded the same respect"). When reviewing inferences drawn by an ALJ, a "court can do no more than require that the ALJ carefully consider the evidence, make reasonable and supportable choices and explain his conclusions." Id. While Plaintiff may disagree with the ALJ's inference that she quit her job for reasons unrelated to her disability, the inference is reasonable and supported by the record. Indeed, Plaintiff does not dispute the ALJ's reasoning for the inference, in which the ALJ noted that Plaintiff informed her primary care physician that she "got 'angry' when she thought about her job and got 'stressed out' because of problems there." (R. 24). Therefore, the ALJ's inference does not consist of pure conjecture or speculation and Plaintiff's argument is without merit.

### vi. Plaintiff's Failure to Follow Recommended[13] Treatment

Finally, the ALJ considered Plaintiff's non-compliance with her treatment recommendations when making his credibility determination. The ALJ noted that

---

[13] The Fourth Circuit has noted that the Seventh Circuit "makes a distinction between 'recommended' and 'prescribed' treatment." Gordon v. Schweiker, 725 F.2d 231, 237 n.2 (4th Cir. 1984) (quoting Cassiday v. Schweiker, 663 F.2d 745, 750 (7th Cir. 1981)). While a claimant may be denied DIB for failing to comply with *prescribed* treatment, a claimant may not be denied DIB solely for failing to follow *recommended* treatment. See id. The Fourth Circuit has not yet adopted this distinction. See id. Nevertheless, an ALJ may indisputably consider a claimant's failure to follow his or her treatment recommendations as one factor in a credibility assessment. See id.; Pearson v. Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *35-36 (N.D. W. Va. June 16, 2015).

Plaintiff "has refused physical therapy and pool therapy several times, and stopped taking Cymbalta without doctor approval." (R. 24). The ALJ then stated that "[t]his appears inconsistent with debilitating symptoms and limitations, and absent any objective medical findings that offer convincing support for her impairment-related claims, undermines her credibility as to her actual limitation and the severity of her symptoms." (Id.).

Plaintiff argues that the ALJ erred when stating that Plaintiff has refused physical therapy several times because, on March 7, 2013, Dr. Hornsby reported that Plaintiff was "agreeable to physical therapy." (R. 568). The undersigned finds that this argument lacks merit. The ALJ noted later in his decision that, while Plaintiff "did state [to Dr. Hornsby] that she was agreeable to physical therapy[,] . . . there is no evidence that she ever attended [a physical therapy session]." (R. 25). The ALJ also noted that Plaintiff had "refused physical therapy on three [other] occasions." (Id.). Therefore, this argument lacks merit.

Plaintiff further argues that the ALJ erred by holding her refusal to attend pool therapy sessions against her because her past sessions "did not provide her with much relief" and because "she is too self conscious about her body . . . to wear . . . a bathing suit in front of anyone." (Pl.'s Br. at 13). The undersigned disagrees. Plaintiff's reasoning for not attending pool therapy sessions does not invalidate the ALJ's statement that her refusal to attend "appears inconsistent with debilitating symptoms and limitations." (R. 24). Nevertheless, assuming *arguendo* that the ALJ should not have held Plaintiff's non-compliance with her treatment recommendations against her, such error was harmless in nature. The ALJ's decision as a whole reveals that Plaintiff was not denied DIB solely

because of her failure to comply with her treatment recommendations. Instead, the ALJ considered Plaintiff's noncompliance as only one factor among many.

### vii. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision[14] and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden.[15] Consequently, the undersigned accords the ALJ's credibility determination the great weight that it is entitled.

## VII. <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

---

[14] Plaintiff argues that the ALJ "again failed to consider or discuss evidence that contradicted his [credibility] finding[ ]." (Pl.'s Br. at 12). The undersigned finds that this argument lacks merit. In Part VI.C.2, the undersigned found that the ALJ had considered all of the evidence before him when progressing through the five-step evaluation process, including when assessing Plaintiff's credibility. Moreover, while the ALJ did not comment on every piece of evidence presented, he thoroughly discussed the factors outline in SSR 96-7p and provided his reasoning for finding Plaintiff not entirely credible, a determination that is supported by substantial evidence.

[15] Plaintiff argues that "[i]t was impossible for the ALJ to properly consider [Plaintiff's] credibility in this case . . . [because t]he ALJ did not believe [Plaintiff] had even established a proper diagnosis of her main disabling impairment." (Pl.'s Br. at 12). The undersigned disagrees. The ALJ gave Plaintiff "the benefit of the doubt" that she suffered from fibromyalgia as defined by SSR 12-2P. (R. 23). Then, after determining that she suffered fibromyalgia, the ALJ concluded that her fibromyalgia was severe in nature. These conclusions directly favor Plaintiff and do not imply that the ALJ was incapable of properly assessing Plaintiff's credibility. To the contrary, as discussed above, the ALJ followed the proper procedure when assessing Plaintiff's credibility and his ultimate determination is supported by substantial evidence.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 19th day of September, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE